IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DANYELLE BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:17-cv-00630 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON | ) | |
| COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The instant case requires the Court to wrestle with, among other things, the fallout from the use of a variant of a word that is widely—although, remarkably, not universally—reviled, perhaps more than any other word in the English language. It is the "n-word"— a word that, for reasons so obvious the Court need not even mention them—seems to bring division, anger and offense wherever it rears its head. And so it is in this case.

Plaintiff Danyelle Bennett filed this action against her now-former employer, Metropolitan Government of Nashville and Davidson County, Tennessee, alleging violation of her rights under the First Amendment to the United States Constitution, article I section 19 of the Tennessee Constitution, and the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment. Pending before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. No. 37), supported by an accompanying brief (Doc. No. 38) to which Defendant filed a response (Doc. No. 51), to which Plaintiff in turn replied (Doc. No. 61). Also before the Court is Defendant's Motion for Summary Judgment (Doc. No. 33), supported by an accompanying brief (Doc. No. 34), to which Plaintiff filed a response (Doc. No. 54), to which Defendant replied (Doc. No. 62). For

the below-stated reasons, Plaintiff's motion will be denied, and Defendant's motion will be granted in part and denied in part.

## FACTUAL BACKGROUND[1]

Plaintiff worked for fifteen years as a dispatcher at the Department of Emergency Communications Center ("the Department") of the Metropolitan Government of Nashville and Davidson County, Tennessee. (Doc. No. 52 at ¶¶ 1-2). The Department requires its employees to wear uniforms. However, each year the Department holds "Super Hero/Villain Day," in which employees may choose to forgo their usual uniforms and instead wear apparel of their choice that depicts a hero or villain (*Id.* at ¶¶ 5-6). On April 13, 2016, the Department held its annual "Super Hero/Villain Day." (*Id.* at ¶ 7). Plaintiff wore a red sweatshirt bearing the name of then-Republican presidential candidate Donald Trump over the slogan "Make American Great Again!" (*Id.* at ¶ 8). The following is a depiction of the sweatshirt:



(*Id.*). Shortly after the morning roll call, Plaintiff's supervisor, Judy Langston, asked Plaintiff to come to Ms. Langston's office. (*Id.* at ¶ 10). Ms. Langston informed Plaintiff that a co-worker had

---

[1] The following facts, unless somehow qualified herein, are taken as true for purposes of the motions at issue, because they are either: (1) asserted and evidentially supported by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by the non-movant and thus credited by this Court even if disputed by the movant; or (4) subject to judicial notice.

complained about Plaintiff's sweatshirt. (*Id*.) Ms. Langston asked Plaintiff to remove the sweatshirt and advised Plaintiff that the sweatshirt was in violation of the Department's dress code policy.[2] (*Id*.). About an hour later, Plaintiff's manager, Lisa Baker, and Assistant Director Angie Milliken informed Plaintiff she could resume wearing the sweatshirt if she desired. (*Id*. at ¶ 17). Plaintiff put the sweatshirt back on. (*Id*.). That afternoon, Ms. Langston again asked Plaintiff to come to her office. (*Id*. at ¶ 12). When Plaintiff arrived, Ms. Langston was accompanied by Ms. Baker. (*Id*. at ¶ 18). Ms. Baker informed Plaintiff that a Service Employees International Union attorney called the Department to report that the union received complaints regarding Plaintiff's sweatshirt and that the attorney believed the sweatshirt was offensive. (*Id*.). Ms. Baker and Ms. Langston asked Plaintiff to remove the sweatshirt for a second time. (*Id*.).

As Plaintiff left the Department premises that afternoon, she noticed a group of co-workers gathered outside the building. (*Id*. at ¶ 22). She believed that they were laughing at her in a mocking manner because she was asked to remove the sweatshirt. (*Id*.). The next day, Plaintiff reported this behavior to Ms. Milliken, who informed Plaintiff that she would investigate the event and ensure any such behavior would not reoccur. (*Id*.).

## II. The Facebook Post

Nearly six months later, on November 9, 2016, the morning after the 2016 Presidential Election, Plaintiff posted an image of an electoral college map that revealed Donald Trump as the winner of the election. (Doc. No. 32-1 at 81 (Dep. Ex. 1)). A Facebook user, identified as Mohamed Aboulmaouabhib, commented on Plaintiff's post of the electoral college map:

---

[2] Policy 1.2 Section IV Alternate Dress Code
 (C) Apparel shall not be altered from its original form to the extent that it is tattered appears unkept, or otherwise provokes controversy.

(*Id*. at ¶ 12).

**Mohamed Aboulmaouahib**

Redneck states voter for Trump , niggaz and latinos states votre for hillary

(*Id.* at 82). Plaintiff responded:

**Danyelle Elaine Bennett**

Thank god we have more America loving rednecks. Red spread across all America. Even niggaz and latinos voted for trump too! 🚂🚂🚂🚂🚂🚂🙏🇺🇸

(*Id.*). Plaintiff's response prompted Shanette Summers, a co-worker of Plaintiff, to comment, "Was the niggaz statement a joke? I don't offense easily, I'm just really shocked to see that from you." (*Id.* at 83). Plaintiff defended her comment and replied that her post was in response to Mr. Aboulmaouabhib's "ignorant message" and she was "only racists against ignorance and rudeness." (*Id.*). Later Derica Lowe, another co-worker commented, "I'm offended and this will be reported. As well as deleted." (*Id.*) Plaintiff's public Facebook page identified her as an employee of the Department. (Doc. No. 55 at ¶ 2).[3]

Plaintiff's Facebook post triggered five co-workers to issue complaints to either their respective supervisors, their respective managers, or the human resources department about the content of Plaintiff's Facebook post. (*Id.* at ¶ 7). Holly Whitworth and NorKeisha Moore approached a supervisor, Lynette Dawkins, and complained of Plaintiff's post. (*Id.* at ¶ 8). Alisa Franklin, Sally Lyons, and Lakeda Logan also issued complaints regarding Plaintiff's post. (*Id.*). Ms. Franklin stated that she did not want to work with someone "that has those derogatory type feelings." (*Id.* at ¶ 9). Ms. Franklin also felt "tension" in the workplace due to Plaintiff's Facebook post. (*Id.*).

---

[3] Facebook pages that are public, rather than marked private, can be seen and "shared" by anyone who has a Facebook account, and not just that user's Facebook "friends" This category of persons who have a Facebook account is only a subset of the public at large, but the Court takes judicial notice of the fact that it is not a small subset, and on this basis recognizes a distinction between Plaintiff's case and situations, seen in some of the case law, in which the public employee's allegedly disruptive comment was made in a private or among a small group.

On November 9, 2016, the same day the post was made, Bruce Sanschargrin, the human resources and training manager for Defendant, called Plaintiff, who was off duty that day, to discuss the post. (*Id*. at ¶ 11). Plaintiff returned Mr. Sanschargrin's phone call at 4:55 p.m. (*Id*.). Mr. Sanschargrin advised Plaintiff of a complaint made against her regarding her Facebook post and asked her to remove it. (*Id*. at ¶ 12). Plaintiff informed Mr. Sanschargrin that she had already done so and had "unfriended" most Department employees. (*Id*. at ¶ 13). Mr. Sanschargrin directed that they discuss the matter further in the morning with Director Donegan. (*Id*. at ¶ 15)

Additionally, Director Donegan received an email from the Office of Neighborhoods, a division of the Mayor's office, informing her of a complaint the office received concerning Plaintiff's Facebook post. (*Id*. at ¶ 9). The citizen complainant indicated that based on the content of Plaintiff's post, the complainant feared a person of color may not receive adequate assistance when calling 911. (*Id*.).

On the morning of November 10, 2016, at a meeting to discuss her Facebook post, Director Donegan and Mr. Sanschargrin expressed their concerns about the impact Plaintiff's Facebook post could have on the office and community. (*Id*. at ¶ 15). Plaintiff indicated she did not feel the post was offensive and was merely mocking the person who posted before her. (*Id*. at ¶¶ 15, 18). Director Donegan informed Plaintiff that she was disappointed in her and decided to place Plaintiff on administrative leave with pay. (*Id*. at ¶¶ 19, 24).

Following the meeting with Plaintiff, Director Donegan addressed the Department employees at roll-call that morning. (*Id*. at ¶ 21). She advised the employees that she was aware of the Facebook post, reminded them to be mindful of what they put on Facebook, and ensured them that the post did not represent the views of the agency. (*Id*.). Director Donegan also instructed the shift supervisors to discuss the post at their respective roll-calls and ensure employees that the

post would be "handled appropriately." (*Id*.). When discussing the post during roll-call, one employee, Ms. Franklin, walked out of the room. (*Id*. at ¶ 22). Ms. Franklin left the room because she believed it "sounded like excuses were being made for a derogatory comment on Facebook." (*Id*.).

An investigation ensued, and when it was complete, Mr. Sanschargrin provided Plaintiff with an investigative summary. (*Id*. at ¶ 23). Mr. Sanschargrin then drafted and gave to Plaintiff a letter placing her on a three-day administrative leave beginning on November 10, 2016. (*Id*. at ¶ 24). Plaintiff did not return to work after her administrative leave was over because she took unrelated FMLA leave for a previously scheduled surgery. (*Id*. at ¶ 25). On December 26, 2016, the Department sent to Plaintiff a charge letter that charged her with violating Civil Service Rules Section 6.7 32 based on an alleged "failure of good behavior which reflects discredit upon himself, the Department and/or the Metropolitan Government" and Civil Service Rules Section 6.7 33 based on alleged "[c]onduct unbecoming of an employee of the Metropolitan Government." (*Id*. at ¶ 26). She was also charged with violating the Information Security Policy, which provides:

> In general, employees who participate in social media and social networking are free to publish their own personal information without censorship by the Metropolitan Government. Employees who choose to identify themselves as the Metropolitan Government employees through social media must state in clear terms that their expressed views are theirs alone and do not reflect the views of the Metropolitan Government. Except as authorized, employees are prohibited from representing the Metropolitan government through their personal use of social media.
>
> Just as employees' behavior outside of work could constitute a failure of good behavior which reflects discredit upon themselves, the Department and/or the Metropolitan Government, their contribution to social media and social networking can do the same. In situations where an employee's social media contribution causes an issue which is substantially related to an important government interest, or which has the effect of creating a disruption in the workplace (e.g., such as where the usage is tied to threatening, discriminatory, harassing, or retaliatory behavior directed at the Metropolitan Government or an employee of the Metropolitan Government), disciplinary action up to and including termination may be merited.

(*Id.* at ¶ 3).

On January 10, 2017, Plaintiff, represented by an attorney, participated in a disciplinary hearing. (*Id.* at ¶ 27). After deliberations, Director Donegan announced that all charges were sustained and that Plaintiff's punishment would be termination of employment. (Doc. No. 32-4 at 33 (Tr. 33:8-24)). According to Director Donegan, her decision was based on her belief that Plaintiff's post detracted from the community's confidence in and respect for the Department and hindered the effectiveness of the organization as a whole. (*Id.* at 32 (Tr. 32:1-33:7)). Director Donegan also explained to Plaintiff her right to appeal the decision. (*Id.* at 34 (Tr. 34:1-6)).

Plaintiff appealed the decision to an administrative law judge, who upheld her termination. (*Id.* at ¶¶ 89, 91). She then appealed to the Civil Services Commission, which also upheld her termination. (*Id.* at ¶ 92). On March 22, 2017, Plaintiff filed this lawsuit alleging violation of her rights under the First Amendment to the United States Constitution, article I section 19 of the Tennessee Constitution, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. (Doc. No. 1). On September 6, 2018, Defendant filed its motion for summary judgment as to all claims except for Plaintiff's First Amendment retaliation claim involving the Trump sweatshirt.[4] (Doc. No. 33). On September 7, 2018, Plaintiff filed her motion for partial summary judgment as to the First Amendment claim involving the Trump sweatshirt. (Doc. No. 37).

---

[4] Defendant's motion states that Defendant is moving for summary judgment, without any qualification indicating that it was moving as to fewer than all claims. Defendant's memorandum in support of its motion likewise indicates that it moved for summary judgment as to all claims. (Doc. No. 33 at 25). However, Defendant's memorandum does not offer any argument explaining why it is entitled to summary judgment on Plaintiff's First Amendment retaliation claim involving the Trump sweatshirt—a claim included within Count I of the Complaint. (Doc. No. 1 at ¶ 62). Thus, the Court will not construe Defendant's motion as seeking summary judgment on this claim. The Court will instead consider Defendant's motion, as it relates to Count I, as seeking summary judgment only as to the other claim set forth in Count I—the claim of First Amendment retaliation. (Doc. No. 1 at ¶ 61).

# LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.,* 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll.*

*of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## ANALYSIS

### I.     Count I: 42 U.S.C. § 1983: Violation of the First Amendment

"'[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.'" *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). While it has been "long 'settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'" *Connick v. Myers*, 461 U.S. 138, 142 (1983), such protections must be construed in balance with the efficient functioning of government services. *Mayhew*, 856 F.3d at 461-62. In other words, if you bring a claim against your employer under the First Amendment, you must convince the court that your interest in speaking openly on a matter of public concern outweighs the government's interest in having an efficient workplace. "Thus, an individual's First Amendment rights as a public employee are narrower than those of the citizenry at large." *Haddad v. Gregg*, 910 F.3d 237, 244 (6th Cir. 2018) (citing *Mayhew*, 856 F.3d at 461-62).

To state a claim for First Amendment retaliation, a plaintiff must establish that:

he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between

elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

Plaintiff claims Defendant retaliated against her for exercising her First Amendment rights on two separate occasions: (1) when she was asked to remove the Trump sweatshirt; and (2) when she was terminated for posting a political post on Facebook that contained a racial slur. Plaintiff has moved for summary judgment as to her First Amendment claim regarding the Trump sweatshirt. Defendant has moved for summary judgment as to Plaintiff's First Amendment claim involving the Facebook post. The Court will analyze each event in turn.

## A. The Trump Sweatshirt

In Plaintiff's motion for partial summary judgment, she seeks summary judgment regarding Defendant's request she remove her Trump sweatshirt, contending that  under the facts not genuinely in dispute, as a matter of law Defendant's request  constituted retaliation in violation of her First Amendment rights provided by the United States Constitution. (Doc. No. 37).[5] Defendant

---

[5] Plaintiff, in her motion for summary judgment, argues this claim by applying the elements of a First Amendment retaliation claim. (Doc. No. 37); *see Briner v. City of Ontario*, 370 F. App'x 682, 704 (6th Cir. 2010) ("True, it might not have been pled that way, but it was (and is) certainly argued that way. This claim must be treated as a retaliation claim."). Additionally, this claim is pled as a 42 U.S.C. § 1983 action in her Complaint. (*See* Doc. No 1 at ¶ 62). Yet, confusingly, in her reply, she argues "Plaintiff has standing to challenge the Defendant's policy forbidding the wearing of apparel that is deemed controversial" and then goes on to cite numerous cases dealing with constitutional challenges to various statutes, regulations, and policies seeking declaratory relief that are not 42 U.S.C. § 1983 actions seeking monetary relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 403 (2013); *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 710–11 (6th Cir. 2015); *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014); *Berry v. Schmitt*, 688 F.3d 290, 297 (6th Cir. 2012). Because these cases are not 42 U.S.C. § 1983 First Amendment retaliation actions and, significantly, do not involve public employment, the Court finds these citations and Plaintiff's argument unhelpful and inapposite. Further, Plaintiff does not request in her Complaint any declaratory or injunctive relief regarding the dress code policy, and even if she did, such relief would not be appropriate for Plaintiff at this juncture, since she no longer works for Defendant. *See Savage v. Gee*, 665 F.3d 732, 740-41 (6th Cir. 2012). Therefore, Plaintiff's claim is construed as a First Amendment retaliation claim, and the arguments in her reply will be disregarded.

argues: (1) Plaintiff does not have standing to bring this claim,[6] and (2) even if she did have standing, Defendant's request that she remove the Trump sweatshirt did not constitute an adverse employment action. (Doc. No. 51 at 2).

The Sixth Circuit has held that "any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action], which may include harassment or publicizing facts damaging to a person's reputation." *Id*. Whether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). Nevertheless, when a plaintiff's alleged adverse action is "inconsequential," resulting in nothing more than a "*de minimis* injury," the claim is properly dismissed as a matter of law. *Id*. at 603, 606. An adverse action "in the employment context has traditionally referred to actions such as discharge, demotions, refusal to [hire], nonrenewal of contracts, and failure to promote." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) (internal quotations omitted).

Plaintiff argues that she suffered an adverse employment action when she was asked to remove the Trump sweatshirt under threat of insubordination "which may have resulted in disciplinary action up to and including termination." (Doc. No. 37 at 5). Defendant argues that Plaintiff's statement that she removed the sweatshirt because of threats of insubordination and discipline are "simply not true." (Doc. No. 51 at 6). Although Plaintiff avers in her affidavit that she removed the sweatshirt under threat of discipline, in her deposition testimony she directly contradicted this statement. (*See* Doc. No. 32-1 at 151:16-152:23). Defendant argues that as the non-moving party, any contradictions in Plaintiff's affidavit and deposition testimony will be

---

[6] Defendant's standing argument also cites cases involving constitutional challenges to statutes and policies, not 42 U.S.C. § 1983 First Amendment retaliation actions. Therefore, its argument and citation to such cases are also unhelpful in this context.

viewed in the light most favorable to it. *See Reed v. City of Memphis, Tenn.*, 735 F. App'x 192, 198 (6th Cir. 2018) ("If an affidavit conflicts with the deposition testimony of a summary judgment movant, the opposite party receives the benefit of the conflict under the requirement that evidence is construed in the light most favorable to the non-moving party."). The Court agrees.

Thus, the Court concludes that viewing the facts most favorable to Defendant, a reasonable jury could conclude that Plaintiff has not suffered an adverse action. Thus, there is a genuine issue of fact as to an element of Plaintiff's retaliation claim, and therefore Plaintiff's motion for partial summary judgment will be denied. The Court finds *Downing v. W. Haven Bd. of Ed.*, 162 F. Supp. 2d 19, 29 (D. Conn. 2001), similar and persuasive. In *Downing*, a public school teacher brought a First Amendment retaliation claim against the school board after she was asked to either take off or cover up her shirt that displayed the words "Jesus 2000." 162 F. Supp. 2d at 22-23. The Court held that although the plaintiff felt "disciplined" by the defendant's reaction to her shirt, there was "no evidence to suggest an adverse employment action as that concept is defined by the law—such as an express or constructive discharge or demotion; a failure to promote; a reprimand or warning; a reference in a personnel file, or the like." *Id*. at 29. The court explained that a First Amendment retaliation claim "requires either a contemporaneous or subsequent adverse impact" from the exercise of a constitutional right, and this was instead "a single incident for which [the plaintiff] suffered no later discipline." *Id*. In order words, the defendant's mere act of putting a stop to the plaintiff's exercise of First Amendment rights—allegedly accomplished here by forcing Plaintiff to remove the sweatshirt—cannot qualify as the necessary act of retaliation by the defendant. Put simply, *halting* the plaintiff's exercise of First Amendment rights is one thing; *retaliating* against the plaintiff based on the exercise of First Amendment rights is another.

Likewise, here, viewing the facts in the light most favorable to Defendant, Plaintiff was simply asked to remove the sweatshirt and was never disciplined in any way for wearing the sweatshirt. Therefore, the Court views Defendant's request that she remove the sweatshirt as the type of "inconsequential" conduct that the Sixth Circuit has instructed does not amount to an adverse action for purposes of a First Amendment retaliation claim. Here, the factfinder could conclude that Plaintiff was merely stopped in—and not retaliated against based on—her exercise of First Amendment rights.

Accordingly, Plaintiff's motion for partial summary judgment will be denied.

## B. The Facebook Post

Next, the Court addresses Defendant's claim in its motion for partial summary judgment that based on facts not genuinely in dispute, as a matter of law Defendant's decision to terminate Plaintiff for the content of her Facebook post does not violate the First Amendment. In Defendant's motion, it argues that it is entitled to summary judgment on Plaintiff's First Amendment retaliation claim because she has not proffered evidence to prove that (1) her Facebook post is constitutionally protected speech; and (2) that her speech was the motivating factor in Defendant's decision to terminate Plaintiff.

First, the Court will define the boundaries of Plaintiff's speech that is at issue. Defendant goes to great lengths to convince the Court that the basis for Plaintiff's termination was only Plaintiff's use of the word "niggaz," and not the post as a whole that indicated Plaintiff's support for Donald Trump. However, when analyzing whether Plaintiff's post deserves First Amendment protection, the Court must view the post in its entirety. "A public employer may not divorce a statement made by an employee from its context[.] . . . Such a tactic could [result in] a statement which, out of context, may not warrant the same level of First Amendment protection it merited

when originally made." *See Rankin v. McPherson*, 483 U.S. 378, 386 n.10 (1987). For example, in this case, if the Court were to analyze only Plaintiff's use of the word "niggaz" in a vacuum without considering the speech surrounding the word (*i.e.*, speech regarding the presidential election), Plaintiff's speech would likely deserve far less protection. *See Devlin v. Kalm*, 630 F. App'x 534 (6th Cir. 2015) (explaining that the plaintiff's use of the word "deadbeat" was "part and parcel of his critique of his public employer" and the court saw "no reason to analyze this single word separately from the entirety of [the plaintiff's] statement"). Accordingly, as instructed to do so by the Supreme Court, the Court will consider Plaintiff's post "in context" and view Plaintiff's post in its entirety when analyzing her First Amendment retaliation claim. *Rankin*, 483 U.S. at 386 n.10.

Defendant's claim that Plaintiff was terminated based solely on the fact that she used the word "niggaz," entirely irrespective of the context, is simply not plausible. At the very least, it is a claim the Court need not accept as established beyond dispute for purposes of summary judgment. Suppose, for example, that one of Defendant's employees had responded to the post of the self-identified Mohamed Aboulmaouabhib by posting, "These niggaz are actually African-Americans, a diverse community of extraordinary folks who have contributed immeasurably to all aspects of the American civilization for 400 years." Or by posting, "These niggaz are not some outside group of recent interlopers seeking to upend the American way of life. Rather, they are African-Americans, who are in fact synonymous with the American way of life—citizens whose ancestors first arrived on these shores in 1619 and, ever since, have played an irreplaceable role in building the infrastructure, economy, military, and cultural traditions and institutions of the United States." The Court cannot imagine that Defendant would terminate any employee making such post merely because, in making very positive (and justified) points about African-Americans, they

happened to use a very negative slur.[7] Termination would be even less fathomable—if such were possible—had the hypothetical poster placed quotation marks around the offensive word or proceeded it with the term "so-called."

But the Court need not rely on mere speculation that Defendant would not terminate employees merely because they used the offensive word, irrespective of content. Rather, this reality is reflected in the record this case. Specifically, as noted above, in response to Plaintiff's post a particular co-employee of Plaintiff used the same word. It appears that, to say the least, Defendant did not view the co-employee as a violator subject to discipline; rather, Defendant viewed her as essentially a victim of offense, rightfully objecting of Plaintiff's post. Defendant plainly appears to recognize that it is one thing to use the word in the specific context—for the specific purpose—of decrying the use of the word, and it may be a very different thing to use the word in some other context, for some other purpose. From this, the Court can only conclude that the mere use of the word, by itself, was not in Defendant's eyes grounds for termination. Rather, context matters to Defendant—and rightfully so. For this reason, and based on the case law cited above, the Court will consider Plaintiff's Facebook post in its entirety and in context.[8]

I. **Constitutionally Protected Speech**

To show she was engaged in constitutionally protected activity, a public employee alleging First Amendment retaliation must satisfy three sub-elements:

---

[7] The Court will not dwell on the evils associated with this word or any variant thereof. Suffice it to say that the Court can bring itself to put the word down on paper only out of a sense of obligation to convey, without sugar-coating, the facts of this case and the Court's resolution of the issues with the requisite candor and clarity.

[8] The Court does not mean to imply in any way that Plaintiff was terminated for posting a message that was pro-Trump. The Court's point is merely that Plaintiff was terminated based on her message as a whole. That is not to say the Court believes that she would not have been terminated based on a very similar message that was pro-Clinton. The Court herein will focus on the substance of the message without regard to the particular candidate supported in the message. Relatedly, to state what should be obvious, this case is not about whether Americans should or should not have supported Donald Trump's presidential candidacy; it is about whether Plaintiff's legal rights have been violated in the manner she alleges.

First, the employee must speak on "matters of public concern." *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010) (citing *Connick*, 461 U.S. at 143). Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id*. at 338 (citing *Garcetti*, 547 U.S. at 421 [126 S.Ct. 1951] [ ] ). Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (quoting *Pickering* [*v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968)).]

*Mayhew*, 856 F.3d at 462. The question whether a public employee's speech is protected is a question of law for the court to decide. *Id*. at 462-464.

Defendant does not affirmatively dispute that Plaintiff's post was made as a private citizen and addressed a matter of public concern (*see* Doc. 51) and the record clearly supports the conclusion that it did. *See Rankin*, 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). Plaintiff's statement was a comment on the results of the 2016 Presidential election, which is a quintessential matter of public concern, and it is undisputed that Plaintiff was not speaking as part of her official employment duties. *See Duke v. Hamil*, 997 F. Supp. 2d 1291, 1293 (N.D. Ga. 2014) (university police officer's Facebook post that included a picture of the Confederate flag and the comment, "It's time for the second revolution," shortly after the conclusion of the 2012 presidential election related to a matter of public concern). Because the speech at issue in this case relates to a matter of public concern, the Court must next employ the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968), to determine if plaintiff's free speech interests outweigh the efficiency interests of her government employer. *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citation omitted).

To prevail in the *Pickering* balancing test, Plaintiff must show by a preponderance of the evidence that her "first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it

performs through its employees." *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000). In striking this balance, the Court considers these factors: whether an employee's comments meaningfully interfere with the performance of her duties or operations of the public employer, undermine the mission of the employer, create disharmony among co-workers, or impair discipline by superiors. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001).

     i.    *Plaintiff's Speech Interest*

The Court begins by assessing Plaintiff's interest in making the post. Plaintiff undoubtedly had a legitimate interest in speaking on a matter of public concern—the results of the 2016 Presidential election. Thus, Plaintiff's post is an "expression on public issues . . . [and] 'rest[ ] on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also Connick*, 461 U.S. at 150 (explaining that the greater the extent to which the speech involves matters of public concern, the stronger the employer's showing must be). However, while the Supreme Court has recognized "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," *Garcetti*, 547 U.S. at 419, the Court finds no evidentiary basis to conclude that Plaintiff's post was particularly "well-informed" compared to the views of others in the community. *See id.*[9] Nonetheless, Plaintiff's speech is protected conduct.

---

[9] Plaintiff argues that her post as a whole was not intended to be racist and her intent was to mock the ignorance of the person who posted before her. (Doc. No. 54 at 6). This view is supported somewhat by the fact that she used the n-word only after it was first used by the prior poster, and the fact that the post—rather than specifically complaining about the persons referred to by the n-word—suggests praise of the voting choices of (at least some of) as them and of their inclusion in a political movement of which Plaintiff approves  But Plaintiff must see how her use of a racial slur word, even under these allegedly mitigating circumstances, on its face could be viewed as conveying a racist message and offend some of her co-workers—especially co-workers who (unlike Defendant) are not inclined to care about context when hearing the word. This is the reality of the particular word used—for very good reason, it has a unique and seemingly unrivaled ability to offend. Thus, even viewing the facts most favorable to Plaintiff, the Court realizes this word could seriously offend Plaintiff's co-workers and the public even if Plaintiff did not intend for her

Weighing heavily in Plaintiff's favor is the fact that her speech was unrelated to her employment and the post was not made while she was on duty. *See Scarbrough*, 470 F.3d at 257-58 ("Speech and conduct that occur outside the office walls and that do not relate to work interfere less with office efficiency than conduct that occurs inside the office or that relates to the employee's work." (citing *Connick*, 461 U.S. at 153)); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1027 (7th Cir. 1994) ("The less [a plaintiff's] speech has to do with the office, the less justification the office is likely to have to regulate it."). Plaintiff's post did not criticize her employer's actions or policies, nor address any topic that related in any way to her duties in the Department of Emergency Services. Thus, the content of Plaintiff's speech weighs heavily in favor of protecting it.

 ii.  *The Department's Interest in Promoting Efficiency*

Next, the Court considers Defendant's efficiency interests. At the outset, the Court emphasizes there is strong deference given to public employers where "close working relationships are essential to fulfilling public responsibilities." *Connick*, 461 U.S. at 151–52 (in such situations, "a wide degree of deference to the employer's judgment is appropriate."). The government "must have wide discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation," because "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.* at 151 (internal quotation marks and citation omitted). These interests have particular resonance in the context of public safety departments, where loyalty, discipline, and workplace harmony are especially important. *See, e.g., Brown v. City of Trenton*, 867 F.2d 318, 322–23 (6th Cir. 1989). Defendant argues that as a public agency that provides

---

post to be racist. *See Duke*, 997 F. Supp. 2d at 1302 ("Plaintiff's intent may not have been to convey an offensive message, but his chosen manner of speech left ample room for interpretation.").

emergency services, the Department must be given wide discretion to manage its internal affairs. But in all of the cases Defendant cites that discuss the importance of a public safety department's ability to control its employees' speech, the public-safety agency at issue was a police department or fire department. The Court finds that the Department's need to control its dispatchers is not as substantial as the need of a police department or fire department to control its personnel. As even young children well know, many employees of fire and police departments (typically but not always uniformed) regularly make vital decisions out in the streets and buildings of our community—decisions which all-too-regularly have life-and-death consequences for those employees and their on-the-job partners. Moreover, such employees well know that on any given day, they may need to rely on each other to quite literally and physically save the lives of each other or other member of the community. In addition, such employees typically work in a regimented command structure involving formal ranks, such as "captain." In this context, the need for loyalty, discipline, and workplace harmony—among such employees but also other employees with less harrowing duties but the same overall mission—is greatly heightened.

No such heightened need has been shown for the Department. Undeniably, the Department performs vital work that can involve teamwork and the saving of lives telephonically, and thus discipline and espirit de corps certainly matter to some extent. But elements such as command structure, and potential reliance on a work partner to save one's life, are simply missing from the Department's equation. Thus, the Court notes that Defendant's need to have strong control over its internal affairs is somewhat less than the need of a police department or fire department to do so.

The Court now turns to the extent of disruption that occurred. Evidence in the record reveals that Plaintiff's post somewhat "interfere[d] with the regular operation of the [the Department],"

*Rankin*, 483 U.S. at 388, although the extent of this disruption is contested by the parties. Although Plaintiff's post was made while she was not on duty, the post was made on a public social-networking website that Plaintiff's co-workers and the public were able to view.[10] Thereafter, the Department received complaints from five separate employees regarding Plaintiff's Facebook post. However, none of these individuals complained that they were unable to perform their job as a consequence of the post. Further, viewing the facts in a manner most favorable to Plaintiff, any time the employees spent issuing complaints and discussing the matter at roll-call was minimal. Defendant's assertion that further disruption occurred (*i.e.*, that Defendant had to set up a special diversity training due to Plaintiff's post) has been placed in genuine dispute by Plaintiff. (*See* Doc. No. 55 at ¶ 40). Thus, construing the facts in favor of Plaintiff, the actual disruption was relatively minimal. The Court emphasizes that upon motion for summary judgment, the Court must avoid credibility determinations and must draw reasonable inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *See Hostettler*, 895 F.3d at 852. Accordingly, at the summary judgment stage, the extent of workplace disruption, although existent, does not weigh heavily in Defendant's favor.

Next, the Court will examine the likelihood that Plaintiff's post could damage the integrity of the Department, which is a relevant consideration. *Rankin*, 483 U.S. at 389 (suggesting that speech "discredit[ing]" a public employer would tend to justify remedial measures). Here, Plaintiff's public Facebook page identified her as an employee of the Department at the time she made a post that contained a racial slur. Plaintiff's "choice to place [the post] on a social media platform risked sharing [it] with a much broader audience." *Duke*, 997 F. Supp. 2d at 1303.

---

[10] "A social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—*but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency.*" *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (emphasis added).

However, Plaintiff in her role as a dispatcher was not in law enforcement or a position of governmental authority; thus, these same considerations are not implicated as strongly.

Additionally, a member of the public saw Plaintiff's post online and complained to the mayor's office. This supports Defendant's belief that Plaintiff's post created a threat to the Department's reputation that could lessen the public's trust in the agency. Yet, viewing the facts most favorably to Plaintiff, the anonymous complaint was made by a sibling of one of the employees that complained, and not by a truly concerned anonymous citizen. (Doc. No. 56 at ¶ 9). This diminishes the weight of this factor in Defendant's favor.

The prospect of disharmony among co-workers does weigh in favor of Defendant. Plaintiff argues that Defendant's concerns of disharmony in the workplace are merely speculative. In support, Plaintiff cites *Whitney v. City of Milan*, 677 F.3d 292 (6th Cir. 2012) for the proposition that "'speculative concerns of workplace disharmony are insufficient to overcome [an employee's] interest in speaking as a private citizen on a matter of public concern.'" (Doc. No. 54 at 15 (citing *Whitney*, 677 F.3d at 298)). However, *Whitney* is completely inapposite here, as it involved a prior restraint claim. *Whitney*, 677 F.3d at 298. The threat of workplace disharmony was "speculative" in that case because the speech had not yet occurred; thus, the plaintiff could only surmise as to what workplace disharmony would occur as a result of the challenged gag order. *Id*. at 298. In contrast, here, there was completed speech (Plaintiff's post) as well as direct evidence that it caused workplace disharmony. Therefore, the issue here is whether disharmony actually occurred (in the past), as opposed to whether it is appropriate to "speculate" as possible disharmony (in the future). And the case Plaintiff cites to support her argument that disharmony did not occur, *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003), is distinguishable.

In *Rodgers*, the defendant argued that it was justified in terminating a public employee who circulated a memorandum criticizing the defendant's policy decision because the memorandum was shared with other employees and "interfered with working relationships." *Id*. at 601. The Sixth Circuit explained that there was no evidence that the plaintiff's memorandum "negatively impacted . . . the operations of [the defendant]" and although it was possible the memorandum may have created disharmony, the court had "never held that the relatively minor associated risk of disharmony . . . would ordinarily overcome an interest" in an employee's First Amendment right to free speech. *Id*. at 602. Further, the court found it relevant that the plaintiff's speech was not "particularly inflammatory," did not contain "abusive language," and did not contain any "exceptionally insulting aspect." *Id*. at 601. In this case, there is direct evidence that Plaintiff's post created disharmony among employees as revealed by the five employees that complained to supervisors and management about Plaintiff's post. In addition, one employee stated to a manager that she did not believe she could continue to work with Plaintiff after reading her "derogatory" post. Further, the court in *Rodgers* emphasized that the memo was not "particularly inflammatory[,]" while here, it is obvious to the Court how Plaintiff's post (with its use of such an inflammatory word) could upset co-workers, and the evidence in the record supports that it did.

Thus the evidence in the record, even when viewed in the light most favorable to Plaintiff, supports that Defendant had valid, reasonable concerns of workplace disharmony among co-workers. Accordingly, this concern weighs in Defendant's favor. However, although the Court does give Defendant's position some weight for the threat of disharmony among co-workers and the minimal disruption that occurred, the Court is mindful to not give these factors too much weight, because they resulted directly from Plaintiff's protected speech. The Sixth Circuit has

issued words of caution for such situations when the disruption or disharmony results directly from the protected speech:

> [The] detrimental impact on the work environment results directly from [the plaintiff's] intended speech and his religious beliefs. It would contravene the intent of the First Amendment to permit the [defendant] effectively to terminate [the plaintiff] for his speech and religious beliefs in this way.

*Scarbrough*, 470 F.3d at 258. The Court believes that *Scarbrough* teaches that disruption and disharmony, though part of *Pickering* balancing, can go only so far towards curtailing First Amendment rights, because the crux of free-speech rights is that generally they can be exercised even if (and perhaps especially when) they cause disruption and disharmony. To be sure, because free-speech rights are limited somewhat in the public-employment context, disruption and disharmony can count in Pickering balancing for *something*—but not nearly for everything.

In conclusion, both parties have legitimate interests on their respective sides of the *Pickering* scale. However, given Plaintiff's significant interest in speaking on a matter of core public concern —which did not relate to her job duties—and the relatively slim evidence of workplace disruption resulting therefrom, the Court concludes Defendant's interest in workplace efficiency is less robust than Plaintiff's interest in commenting on a presidential election. Further, Accordingly, when viewing the facts most favorable to Plaintiff, the *Pickering* balance tilts clearly (if only moderately) in Plaintiff's favor, thus, Defendant is not entitled to summary judgment as to Plaintiff's First Amendment retaliation claim involving the Facebook post.

## II.  Substantial/Motivating Factor

Next, the Court considers whether Defendant's decision to terminate Plaintiff was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right," *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999).

In its motion, Defendant expends much time arguing that Plaintiff's termination was due to her use of a racial slur and lack of accountability, *not* her political views. (Doc. No. 33). Thus, in Defendant's view, since Plaintiff's racial slur was the motivating factor for her termination and not her support of President Trump, Plaintiff cannot prove that her exercise of free speech was the motivating factor of her termination. Plaintiff in turn expends much effort arguing why her support of President Trump was the actual reason for her termination.

These dueling efforts were wasted inasmuch as Defendant's argument misses the mark. It is undisputed that Defendant terminated Plaintiff for the post she made on November 10, 2019. As noted above, the Court must consider the termination as based upon the post in its entirety with, among other things, the racial slur word considered in context. *If* the Court were to hold the post was constitutionally protected speech, the entirety of Plaintiff's post would receive First Amendment protection, including the racial slur. *See McMullen v. Carson*, 754 F.2d 936, 940 (11th Cir. 1985) (expression of racist views is protected); *see also Devlin*, 630 F. App'x at 540 ("[W]e see no reason to analyze this single word separately from the entirety of [the plaintiff's] statements—which we already have found to be protected[.]"). Defendant cannot simply chop off the parts of the post that it apparently believes are protected by the First Amendment and argue that the remaining part was the reason for the termination. *Cf. Rodgers*, 344 F.3d at 603 ("The parties do not dispute that Plaintiff's [] memo at least played a role in Defendant's decision to terminate Plaintiff. Indeed, Defendant identified that very memo during her deposition as a motivating factor. Therefore, Plaintiff has established a causal link between her First Amendment protected activity and her subsequent termination."). This is especially true because, as discussed above, the Court cannot conclude on this record that Plaintiff was terminated based on her use of the n-word completely irrespective of the context in which it was used.

Accordingly, the Court rejects Defendant's argument as a reason to grant its motion to dismiss Plaintiff's First Amendment retaliation claim contained within Count I. And because (as noted above in footnote 4) Defendant presented no argument supporting summary judgment in its favor as to Plaintiff's First Amendment claim based on the Trump sweatshirt, which is also contained within Count I, the Court will deny Defendant summary judgment as to Count I in its entirety.

### Count II: Violation of Article I, Section 19 of the Tennessee Constitution

Plaintiff contends Defendant's above-described actions also violated the guarantees of free speech and free expression found in the Article I, Section 19 of the Tennessee Constitution. (Doc. No. 1 at ¶¶ 65-70). There is no private right of action for damages under the Tennessee Constitution. *See Cline v. Rogers*, 87 F.3d 176, 179–180 (6th Cir. 1996); *Bowden Bldg. Corp. v. Tenn. Real Estate Com'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999). In response, Plaintiff concedes this point and asserts that she is seeking a declaratory judgment that Defendant's actions violated the Tennessee Constitution, not monetary damages. Plaintiff's Complaint does not seek declaratory judgment for her claim involving the Trump sweatshirt, but rather seeks only damages. Accordingly, this claim is dismissed. Plaintiff's Complaint seeks declaratory judgment in regard to the claim involving the Facebook post, but for the same reasons discussed below when analyzing Plaintiff's due process claim, Plaintiff does not have standing to bring a declaratory judgment action. *See Savage v. Gee*, 665 F.3d 732, 740-41 (6th Cir. 2012). Because Plaintiff cannot receive the relief she seeks, her claim alleging violations of the Tennessee Constitution will be dismissed.

### Count III: Violation of the Equal Protection Clause

Plaintiff claims that Defendant's actions violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Specifically, the Complaint alleges

Defendant selectively enforced its Civil Service Rules as well as its Social Media Policy against Plaintiff, creating a double standard which discriminates against the Plaintiff in violation of the Equal Protection Clause of the United States Constitution. (Doc. No. 1 at ¶ 74). Further, the Complaint specifically states, "[t]he Supreme Court has recognized successful equal protection claims brought by a 'class of one,' in which a plaintiff alleges that the government has intentionally and without a rational basis treated her differently from others who are similarly situated." (*Id.* at ¶ 73).

But in 2008, the Supreme Court held that "the class-of-one theory of equal protection has no application in the public employment context[.]" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 605 (2008). The Court explained that the equal protection clause is implicated when the government makes class-based decisions in the employment context (*i.e.*, treating distinct groups of individuals categorically differently). *Id.* Thus, to maintain a successful equal protection claim, a public employee must claim discrimination on the basis of membership in some class or group. *Id.* The Court found that the class-of-one idea was inconsistent with the notion of at-will employment and that government employment, by its nature, involves "discretionary decision-making based on a vast array of subjective, individualized assessments." *Id.* at 603; *see also Hines v. Town of Vonore*, 912 F. Supp. 2d 628, 649 (E.D. Tenn. 2012) (dismissing equal protection claim of terminated public employee in light of *Engquist*); *O'Brien v. City of Saginaw*, No. 10–12700–BC, 2011 WL 3799649, at *6 (E.D. Mich. Aug. 26, 2011) (same).

In Plaintiff's response to Defendant's motion for summary judgment, Plaintiff does not oppose dismissal of this claim "[b]ased on the Supreme Court's holding in *Enqquist*[.]" (Doc. No. 54 at 21 n.9). Because Plaintiff's equal protection claim is not cognizable in light of *Engquist*, the claim will be dismissed.

**<u>Count IV: Violation of the Due Process Clause</u>**

Plaintiff seeks a declaratory judgment that the social media policy as contained in Defendant's employee handbook violates her Fourteenth Amendment right to due process because the language is overly broad and vague. (Doc. No. 1 at ¶ 69-75).

In support of summary judgment, Defendant cites the elements of a procedural due process claim and argues that for purposes of a section 1983 claim, "the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate." (Doc. No. 33 at 24 (citing *Hanh v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)) (internal quotation marks omitted). Defendant asserts that Plaintiff's due process claim must fail because she has not "even plead inadequate state law remedies, let alone 'prove' they are inadequate." (*Id.*) Plaintiff fails to respond to this argument at all, but in any event the Court finds Defendant's argument is inapposite; Plaintiff seeks a declaratory judgment declaring Defendant's social medial policy unconstitutional and not monetary damages pursuant to section 1983.[11]

Nevertheless, the Court finds that Plaintiffs claim should still be dismissed for lack of standing to obtain the requested declaratory relief because, as a former employee, she is no longer affected by the challenged policies. A plaintiff seeking to invoke the jurisdiction of the federal courts "must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). The "irreducible constitutional minimum of standing contains three requirements: (1) injury in fact, (2) causation, and (3) redressability." *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 659 (6th Cir. 2007) (quotation marks omitted). "'Injury in fact' is a harm suffered by the plaintiff that is

---

[11] Additionally, Defendant assumes that Plaintiff is bringing a procedural due process claim. The assumption is unwarranted. Plaintiff has instead brought a void-for-vagueness claim, which is distinct from a procedural due process claim.

'concrete and actual or imminent, not conjectural or hypothetical.' 'Causation' is 'a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.' 'Redressability' is 'a likelihood that the requested relief will redress the alleged injury.'" *Id*. (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)); *see also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976). In other words, "Article III standing ultimately turns on whether a plaintiff gets something (other than moral satisfaction) if the plaintiff wins." *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 612 (6th Cir. 2007).

Consistent with these standing principles, the Supreme Court has held that a plaintiff's standing to seek injunctive or declaratory relief depends on the likelihood of future harm. *See Lyons*, 461 U.S. at 105. Thus, when the plaintiff has lost the employment or position that subjected the plaintiff to the rule of which he complains, and it is "'most unlikely' that [the plaintiff] would again be subject to the [rule], no case or controversy of 'sufficient immediacy and reality' was present to allow a declaratory judgment." *Id.* at 104 (quoting *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

Here, Plaintiff is no longer an employee of Defendant, therefore, even if the Court were to grant the relief she requests, she would not benefit from it. Moreover, Plaintiff has failed to establish that she is in immediate danger of injury resulting from the social media policy she challenges as unconstitutional. Plaintiff is not presently employed with Defendant; thus, she is no longer affected by Defendant's policies. Further, Plaintiff, in her complaint, does not seek reinstatement to her former position. Obviously, Plaintiff cannot again be terminated unless and until such time as she is rehired by Defendant. *See Savage*, 665 F.3d at 740-41 (affirming the dismissal of a former professor's challenge to a university's policies because he resigned from the faculty after he filed suit, and thus he could not show that he had a reasonable expectation of any

imminent enforcement of the challenged policies against him); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) (affirming dismissal where a former government employee sought equitable relief in the form of a judgment declaring the defendants' policy as violative of the First Amendment, because the plaintiff was no longer an employee and would not benefit from the relief requested).

Accordingly, the Court concludes that Plaintiff's termination deprives her of standing to seek a declaratory judgment that the social media policy as contained in Defendant's employee handbook violates her Fourteenth Amendment right to due process. Moreover, the Court would have broad discretion not to entertain a declaratory judgment action even if it did have jurisdiction. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287–88 (1995) (If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action."). Based on the same considerations that lead the Court to conclude that Plaintiff lacks standing to obtain a declaratory judgment, the Court determines alternatively that a declaratory judgment would serve no useful purpose. Therefore, this claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** in part and **GRANT** in part Defendant's Motion for Summary Judgment (Doc. No. 33). The Court will grant Defendant's motion for summary judgment as to Plaintiff's claim of violation of her rights under article I section 19 of the Tennessee Constitution (Count II); the Equal Protection Clause of the Fourteenth Amendment (Count III); and Due Process Clause of the Fourteenth Amendment (Count IV). These claims will be dismissed. The Court will deny Defendant's motion for summary judgment as to Plaintiff's claim of violation of her rights under the First Amendment.

Further, the Court and will **DENY** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 37).

An appropriate order will be entered.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE